UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

MICHAEL BAEHL and JERRI BAEHL,    )
        Plaintiffs,    )
            )
   vs.    )    3:12-cv-00029-RLY-WGH
            )
BANK OF AMERICA, N.A.,    )
        Defendant.    )

**ENTRY ON DEFENDANT'S MOTION TO DISMISS**

      Plaintiffs, Michael Baehl and Jerri Baehl, filed this civil action against Defendant,

Bank of America, N.A. ("BOA"), alleging violations of the Real Estate Settlement

Procedures Act ("RESPA") and related state law claims of fraud, negligence, breach of

contract, and constructive fraud.  BOA filed a motion to dismiss all claims pursuant to

Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, BOA's motion

is **DENIED IN PART** and **GRANTED IN PART**.

**I.    Background**

      According to the allegations in the amended complaint, the facts are as follows.

Plaintiffs executed a promissory note ("Note") dated January 30, 2008, and are

mortgagees to the mortgage ("Mortgage") dated January 30, 2008.  (Amended Compl. ¶¶

2-3, Exs. A, B).  In January 2009, Plaintiffs contacted the mortgage servicer,

Countrywide, to help with the loan due to financial difficulties.  (*Id*. at ¶¶ 8-9).  On

January 30, 2009, Countrywide granted Plaintiffs a special forbearance.  (*Id*. at ¶ 10).  In

February 2009, Plaintiffs asked Countrywide about the Home Affordable Mortgage

Program ("HAMP").  (*Id*. at ¶ 11).

In early 2009, BOA acquired Countrywide's interest in the Note and Mortgage and began corresponding with Plaintiffs in March or April of 2009. (*Id*. at ¶¶ 12-13). Plaintiffs asked BOA about the status of their hardship application several times from April to July in 2009. (*Id*. at ¶¶ 14-15). BOA told Plaintiffs their debt was in special forbearance, a modification was expected soon, and no payments were needed at that time. (*Id*. at ¶ 15). On September 3, 2009, BOA alerted Plaintiffs that BOA did not have any hardship or modification paperwork concerning their loan, so Plaintiffs resent BOA this information that same day. (*Id*. at ¶¶ 16-17). On November 13, 2009, BOA sent a HAMP modification to Plaintiffs and requested acceptance by December 1, 2009. (*Id*. at ¶ 19). On November 30, 2009, Plaintiffs accepted and returned the HAMP Trial Period Plan ("TPP") modification, along with the first payment. (*Id*. at ¶¶ 20-21). Prior to Plaintiffs' acceptance of the HAMP, BOA sent another proposed modification on November 23, 2009, and required acceptance by December 14, 2009. (*Id*. at ¶ 22). BOA stated that this modification "would be better than HAMP," so Plaintiffs executed it on December 2, 2009, and made the required payment on December 4, 2009. (*Id*. at ¶¶ 23-24).

On February 22, 2010, BOA requested additional information for the HAMP modification, and Plaintiffs provided such information by the deadline. (*Id*. at ¶¶ 25-26). On April 16, 2010, BOA notified Plaintiffs that they were in default on the Mortgage; Plaintiffs, however, contend they made payments to BOA on November 30, 2009; December 4, 2009; January 4, 2010; February 10, 2010; February 25, 2010; and March 30, 2010. (*Id*. at ¶ 27). On May 21, 2010, BOA alerted Plaintiffs that they did not

qualify for HAMP, but sent them another modification a week later.  (*Id*. at ¶¶ 28-29).
Plaintiffs executed and tendered the required payment on June 3, 2010.  (*Id*. at ¶ 30).

Despite these various payments to BOA, on September 9, 2010, Plaintiffs first
noticed that all payments to BOA were not listed as payments but instead as
"miscellaneous postings."  (*Id*. at ¶ 31).  As such, BOA did not properly apply the
payments to principal, interest, escrow, or PMI.  (*Id*.).  Instead, BOA reported all 2010
payments as unpaid, which harmed Plaintiffs' credit rating.  (*Id.* at ¶ 32).

On July 28, 2011, Plaintiffs mailed a letter to BOA ("July Letter") requesting
numerous actions, accountings, and corrections on their Mortgage.  (*Id*. at ¶ 33).  BOA
acknowledged receipt of this letter on August 4, 2011, but did not otherwise respond to
the substance of the letter.  (*Id*. at ¶ 34, Ex. I).  Similarly, on August 15, 2011, Plaintiffs
mailed a letter to the Comptroller of Currency ("August Letter"), which was then
forwarded to BOA, to the attention of the Department of Executive Customer Relations,
Office of the CEO and President.  (*Id*. at ¶ 35).  This letter also requested "information,
clarification, an accounting, and/or disputing the allocation of funds paid."  (*Id*.).  BOA
acknowledged receipt of this letter on August 29, 2011.  (*Id*. at ¶ 36, Ex. J).  On October
17, 2011, BOA responded to the August Letter but did not provide an accounting of the
payments made by Plaintiffs or the effect of the prior modifications to the Note.  (*Id*. at ¶
38).  During this time, Plaintiffs also negotiated a short sale of the real estate at issue, but
BOA denied this on September 4, 2011.  (*Id*. at ¶ 37).

Based on these facts, Plaintiffs allege that multiple, illegal and unauthorized
charges were debited and charged against the escrow account and the Mortgage.  (*Id*. at ¶

39).  Further, Plaintiffs allege that BOA failed to credit payments made pursuant to prior loan modifications.  (*Id*. at ¶ 40).  As a result, on February 16, 2012, Michael Baehl filed a complaint in the Vanderburgh Circuit Court, alleging violations of RESPA, breach of good faith and fair dealing, and breach of fiduciary duty.  BOA removed the matter to this court on March 13, 2012, and filed its first motion to dismiss for failure to state a claim on April 17, 2012.  Plaintiffs filed an Amended Complaint on May 24, 2012, which added and modified the causes of action to include claims for RESPA, fraud, negligent loan processing and lending practices, breach of contract, and constructive fraud.  Also, the amended complaint added an indispensable party, Jerri Baehl.  BOA filed a second motion to dismiss on June 19, 2012.  On June 26, 2012, the court denied BOA's first motion to dismiss as moot.  The court now turns to BOA's second motion to dismiss.

## II.    Standard

Federal Rule of Civil Procedure 12(b)(6) permits the district court to dismiss a complaint for failure to state a claim for which relief can be granted.  The purpose of the motion is to test the legal sufficiency of the complaint, not to resolve the case on the merits.  *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990).  To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   In deciding this motion, the court accepts as true all well-pleaded factual allegations in the complaint, and any inferences reasonably drawn from those facts are construed in the light most

favorable to the plaintiff. *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1416 (7th Cir. 1992).

A complaint need only provide "a short and plain statement of the claim" showing that plaintiff is entitled to relief and be sufficient to provide the defendant with fair notice of the claim and its basis. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Indeed, this is a heavy burden for the party moving to dismiss because an adequately stated claim "may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563 (citation omitted). Although "detailed factual allegations" are not required, the plaintiff must allege facts that raise the possibility of relief above the "speculative level." *Id.* at 555. As a result, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678.

### III.   Discussion

#### A. Federal Claim

##### 1. RESPA

By way of background, RESPA is a consumer protection statute that regulates the real estate settlement process, including servicing of loans and assignment of those loans. *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011) (citing 12 U.S.C. § 2601 (Congressional findings)). The statute imposes a number of duties on servicers of federally related mortgage loans, particularly when they receive a qualified written request ("QWR") from a borrower. 12 U.S.C. § 2605(e). A QWR is a written

correspondence (other than notices on a payment coupon or similar documents) from the borrower or her agent that requests information or states reasons for the borrower's belief that the account is in error. 12 U.S.C. § 2605(e)(1)(B). In addition, the QWR must include or otherwise enable the servicer to identify the name and account of the borrower. *Id*.

Upon receipt of a QWR, a servicer must provide a written response acknowledging receipt of the QWR within twenty days. 12 U.S.C. § 2605(e)(1)(A). Then, the servicer must take one of three actions within sixty days of receiving the QWR: (1) correct the borrower's account and provide the borrower written notification of such corrections; (2) investigate and provide the borrower a written explanation of the reasons for which the servicer believes the borrower's account is correct; or (3) investigate and provide the borrower a written explanation why the requested information is unavailable. 12 U.S.C. § 2605(e)(2). Regardless of which action is taken, the servicer must provide a name and telephone number of a representative of the servicer who can assist the borrower. *See id.* During this sixty-day period, "a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or [QWR], to any consumer reporting agency . . . ." 12 U.S.C. § 2605(e)(3).

Here, Plaintiffs contend that BOA violated RESPA by failing to respond to one QWR (July Letter) and improperly responding to another QWR (August Letter). In response, BOA contends that Plaintiffs have failed to state a claim because the July Letter does not qualify as a QWR and BOA's response to the August Letter complied with RESPA. The court now turns to these issues.

6

### a.  July Letter

As discussed above, a QWR must reasonably identify the borrower and account and must "include a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."  12 U.S.C. § 2605(e)(1)(B).  As such, "[a]ny reasonably stated written request for account information can be a qualified written request."  *Catalan*, 629 F.3d at 687.  Indeed, "RESPA does not require any magic language before a servicer must construe a written communication from a borrower as a qualified written request and respond accordingly."  *Id*.  Instead, a borrower should provide reasons for a belief that the account is in error to the extent he is able, but "any request for information made with sufficient detail is enough under RESPA to be a qualified written request and thus to trigger the servicer's obligations to respond."  *Id*.

Here, Plaintiffs argue that the July Letter qualifies as a QWR because it requested "numerous actions, accounting, and corrections" to be taken on their account.  (Amended Compl. ¶ 33).  BOA counters that the July Letter is not a QWR because it "merely disputes a debt," "fails to provide the reasons for the alleged error with their account," and does not provide sufficient details regarding the information sought.  Despite BOA's contentions, it is difficult to imagine what constitutes a QWR if the July Letter does not.

First, Plaintiffs clearly identify the name and account number of the borrower. Second, the July Letter does not fail simply because it does not contain the phrase "qualified written request."  *See Vician v. Wells Fargo Home Mortg.*, No. 2:05-cv-144, 2006 WL 694740, at *4 (N.D. Ind. Mar. 16, 2006) (stating plaintiffs' complaint does not

fail merely because the letter does not contain the phrase "qualified written request").

That said, Plaintiffs characterized the letter as "our official letter of dispute," so it should

not have been discarded as a mere administrative matter.

Third, the two-page July Letter seeks information and points to alleged errors in

accounting, including BOA's failure to process payments.  Relevant inquires include:

- Why [have] my payments been reported to the credit bureau as being late or not paid when all of the payments in 2010 were made?  (When I applied for a  loan recently I was told no because my Mortgage has been in foreclosure since 2010)

- Why is part of our payment . . . put into the interest/Buydown field and is never applied to our loan?  There is nothing in our contract that states part of our payment will be taken for other things.

- Why is the escrow balance always at a negative, even though we are making a full payment of Principal, Interest, Escrow and PMI?

- Why are we still paying PMI?

- Why did [BAC Home Loan Processing] only report $6,513.00 in interest we paid for 2010 when we paid all 12 payments and then some for a total of $26,194.06?  Also, why is does [sic] my credit state my mortgage is in foreclosure when I paid every payment?

(Amended Compl., Ex. H).

Finally, from a policy standpoint, the July Letter must satisfy the requirements of a

QWR.  By BOA's argument, a lender would have no obligation to respond to a borrower

who claimed her account was in error but could not provide specific reasons for that

belief.  This is an untenable result under the language of the statute as no magic language

is necessary when disputing one's account.  *See Catalan*, 629 F.3d at 686-87.

In sum, this letter is a thorough statement of "the reasons for the belief of the

borrower, to the extent applicable, that the account is in error" while also providing

"sufficient detail to the servicer regarding other information sought by the borrower."  Of course, some of the information requested by Plaintiffs may have been "unavailable or [unable] to be obtained by the servicer" under section 2605(e)(2)(C), but whether the information sought by Plaintiffs was unavailable or whether the questions were unanswerable does not negate the fact that Plaintiffs satisfied their obligations.  Thus, taken in the light most favorable to Plaintiffs, the July Letter constitutes a QWR.  *See Chatman v. Fairbanks Capital Corp.*, No. 02-c-665, 2002 WL 1338492, at \*7 (N.D. Ill. June 18, 2002) (finding letter qualified as QWR for purposes of motion to dismiss where letter identified that plaintiffs disputed the application of their payments and related alleged misconduct).

Because the July Letter constitutes a QWR, BOA was obligated to respond. Plaintiffs allege that no response was made to this QWR nor does BOA argue that such a response was made.  "Allegations stating that the plaintiff sent a written request to a servicer and did not receive a response from the servicer are sufficient to state a claim for a violation of RESPA."  *Vician*, 2006 WL 694740 at \*3; *see also Ploog v. HomeSide Lending, Inc.*, 209 F.Supp.2d 863, 868 (N.D. Ill. 2002) (finding allegations sufficient to state a claim for violation of RESPA where plaintiff alleged that she never received a written response to multiple letters sent to her lender informing it of errors and requesting corrections).  Accordingly, Plaintiffs have stated a claim upon which relief may be granted as to the July letter.

### b.  August Letter

Plaintiffs also allege that BOA violated RESPA by "failing to properly respond to all inquiries" raised in the August Letter.  (Amended Compl. ¶ 43).  Plaintiffs did not attach the August letter, but simply allege the letter "request[ed] information, clarification, an accounting, and/or disputing the allocation of funds paid."  (*Id*. at ¶ 35). BOA argues the letter cannot qualify as a QWR because Plaintiffs not only failed to attach this purported letter, but also failed to provide any indication of the contents or demands of the letter.   Additionally, BOA contends it promptly responded to the request and there is no indication that its response was insufficient.

First, BOA's argument concerning Plaintiffs' failure to attach the August Letter is groundless as "a plaintiff is under no obligation to attach to her complaint documents upon which her action is based, but a defendant may introduce certain pertinent documents if the plaintiff failed to do so."  *Venture Associates Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).  This is because Federal Rule of Civil Procedure 10(c), which states that a "copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes," is permissive in nature.  *Id*.  By application, Plaintiffs were not required to attach the August Letter; however, BOA could attach the letter to its motion to dismiss because the letter is referred to in Plaintiffs' complaint and is central to their claim.  *See id.*  BOA, however, chose not to attach the letter, but instead points to the absence of the letter.  This omission is not fatal to Plaintiffs' claim.

Although the allegations in the complaint are admittedly vague as to the contents of the August Letter, it seems remarkable for BOA to question whether the letter qualified as a QWR when it sent Plaintiffs a letter on August 29, 2011, acknowledging receipt of the August Letter and stating the following:

> After reviewing your request, we are treating your correspondence as a "Qualified Written Request" under Section 6(e) of the Real Estate Settlement Procedures Act (RESPA) because you have made inquiries regarding the servicing of your account.

(Amended Compl., Ex. J).  This acknowledgment of BOA's receipt of the letter and BOA's interpretation of the letter as a QWR is sufficient for the August Letter to be deemed a QWR for purposes of the motion to dismiss.

Moreover, Plaintiffs allege, and BOA does not dispute, that BOA responded to the August Letter on October 17, 2011 ("October Response"), within the 60-day period required by RESPA.  (*Id.* at ¶ 38; Def.'s Reply 2).  BOA's timely response, however, does not end the inquiry, as that written response must do one of three things: (1) correct the account; (2) provide a written explanation why account is correct; or (3) provide an explanation why requested information is unavailable.  12 U.S.C. § 2605(e)(2).  Plaintiffs allege that BOA's October Response "fail[ed] to properly respond to all of [their] inquiries," particularly that BOA "failed to provide an accounting of the payments made by [Plaintiffs] on the Note or the effect of the prior modifications to the Note." (Amended Compl. ¶¶ 38, 43).

As an initial matter, Plaintiffs' claim based solely on a lack of an accounting is not actionable.  Nothing in RESPA states that an accounting must be made if a QWR is

received.  BOA is only required by statute to respond by way of one of the three listed options.  As to BOA's alleged failure to "properly respond" to Plaintiffs' QWR, that is an issue of fact not to be decided in a motion to dismiss.

More pragmatically, because neither party attached either the August Letter or the October Response, the court cannot decide the issue at this time.  Taking the facts in the light most favorable to Plaintiffs, it is possible that the letter neither made corrections to the account, nor provided information as to why the account was correct, nor explained why the requested information was unavailable; thus, the letter would be actionable.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (stating "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely").  Because notice pleading only requires Plaintiffs to put BOA on notice, with facts taken in the light most favorable to Plaintiffs, the RESPA claim concerning the August Letter survives the motion to dismiss standard, albeit by a close call.  Accordingly, BOA's motion to dismiss is **DENIED** as to the RESPA claim.

### B.  State Claims

Plaintiffs' remaining claims are brought under Indiana law.  The court has supplemental jurisdiction over the claims pursuant to 28 U.S.C. § 1367(a).

### 1.  Fraud

Under Indiana law, a plaintiff must show there is "a material misrepresentation of past or existing fact made with knowledge of or reckless disregard for the falsity of the

statement, and the misrepresentation [is] relied upon to the detriment of the relying party." *Schott v. Huntington Nat. Bank*, No. 1:12-cv-00430, 2012 WL 6725902, at *7 (S.D. Ind. Dec. 27, 2012).  When a plaintiff alleges fraud, she must clear an additional hurdle of "stating all such averments with particularity." *Id*. at *3.  As such, "[o]verly general allegations of fraud and misrepresentation do not satisfy the heightened pleading standard." *Id*. at *7.  Further, these allegations must be in the complaint itself and cannot be supplemented by a response brief.  *Kennedy v. Venrock Associates*, 348 F.3d 584, 593 (7th Cir. 2003).  On the other hand, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED.R.CIV.P. 9(b).  Simply put, "[p]roviding the defendant with fair notice is perhaps the most basic consideration underlying Rule 9(b)" as it forces "plaintiff to do more than the usual investigation before filing his complaint."  *Hirata Corp. v. J.B. Oxford & Co.*, 193 F.R.D. 589, 592 (S.D. Ind. 2000) (internal quotations and citation omitted).

The Seventh Circuit stated a plaintiff may satisfy Rule 9(b) by alleging a "general outline" of the circumstances which would "reasonably notify the defendants of their purported role in the scheme."  *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992).  This outline generally must include "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the representation was communicated."  *Hirata Corp.*, 193 F.R.D. at 592 (citation omitted).  This requirement assures that "the charge of fraud is responsible and supported, rather than defamatory and extortionate."  *Id*.  The requirements will be somewhat tempered, however, when a plaintiff "does not have access to all the facts

necessary to provide details, such as when those facts are within the exclusive knowledge of the defendant." *Id*. (citations omitted).

Here, Plaintiffs assert the following allegations to support their claim of fraud: (1) BOA intentionally and materially misled them as to the best modifications and terms to accept on November 23, 2009; (2) BOA represented that the Note was in "special forbearance; that no payments need be made for a specified period of time; that certain loan modifications would be more beneficial than HAMP; and the continuing loan modifications were beneficial to Plaintiffs"; (3) Plaintiffs relied on BOA's representations to their detriment "while under duress and extreme financial hardship"; and (4) as a result, Plaintiffs were induced to accept the terms of BOA's loan modifications, to Plaintiffs' detriment.  (Amended Compl. ¶¶ 47, 48, 50, 51).  BOA contends this is not enough, as Plaintiffs failed to satisfy "the who, what, where and when federal pleading standard for fraud claims."  (Def.'s Mem. Law 8).  The court agrees.

As a preliminary matter, Plaintiffs generally identify the "who" as BOA's "representatives."  Identification of the individual employee is not necessary at this time because "institutional identifications meet the Rule 9(b) standard."  *MDG Int'l, Inc. v. Australian Gold, Inc.*, No. 1:07-cv-1096, 2008 WL 3982072, at *3 (S.D. Ind. Aug. 22, 2008) (citing *Blaz v. Michael Reese Hosp. Found.*, 191 F.R.D. 570, 574 (N.D. Ill. 1999) (finding the institutional identity of the caller is what matters, not the individual employee, so plaintiff sufficiently pled the "who" requirement of Rule 9(b))).  Thus, the "who" is satisfied here.

But the "what" is fatal to Plaintiffs' cause of action.  Neither the Complaint nor the QWR contain specific misrepresentations made by BOA, other than the bare-bones, conclusory allegations that BOA "intentionally and materially misled them as to the best modifications and terms to accept."  (Amended Compl. ¶ 48).  Plaintiffs attempt to supplement this by alleging that BOA stated the proposed loan modifications would be more beneficial generally, and more than HAMP, in particular.  (*Id*. at ¶ 51).  These allegations do not constitute actionable misrepresentations as they would not put BOA on notice of the substance of the alleged misrepresentations.  It is not clear whether the BOA representative claimed the proposed modification would be beneficial short-term or long-term; or whether it would create immediate debt relief or long-term savings; or whether it created additional time to defer payments; or a myriad of other possibilities.  For the claim of fraud, BOA is not obligated to discover these alleged misrepresentations; instead, Plaintiffs should have already put them on notice, as they were required to "do more than the usual investigation before filing [their] complaint."  *Hirata Corp.*, 193 F.R.D. at 592.  Similarly, Plaintiffs' allegation that BOA "misled them as to the best modifications" is equally ambiguous.  Again, this does not put BOA on notice as to what the actual misrepresentations were, but is bathed in the type of generalities deemed insufficient under Rule 9(b).

Plaintiffs contend that BOA's "internal, customer-service procedures" hindered its access to this information and that, moreover, BOA has this information in its records and under its control.  As noted above, the requirements of Rule 9(b) may be somewhat relaxed where defendants are "corporate insiders," but even then, "the particularity

requirement is loosened only if the complaint sufficiently describes the fraudulent acts and provides the individuals with sufficient information to answer the allegations." *Winforge, Inc. v. Coachmen Indus., Inc.*, No. 1:06-cv-619, 2007 WL 854025, at *5 (S.D. Ind. Mar. 13, 2007). The Complaint does not contain a single, specific alleged misrepresentation other than bare-bone generalities. Even more, given that all of these alleged misstatements were communicated over the phone, Plaintiffs had equal access to those alleged actionable statements as BOA. It is inconceivable that Plaintiffs truly had no way to muster at least some specific information about the alleged misrepresentations. *See id*. As a result, the relaxed pleading standard is not applicable to the "what" requirement for alleging fraud, and even if it were, Plaintiffs do not meet that standard here. Accordingly, BOA's motion to dismiss is **GRANTED** as to the fraud claim.

### 2.  Constructive Fraud

To state a claim for constructive fraud, Plaintiffs must prove: (1) a duty owing by the party to be charged to the complaining party due to their relationship; (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996). In particular, a constructive fraud action requires a "fiduciary or other 'special' relationship." *Epperly v. Johnson*, 734 N.E.2d 1066, 1074 (Ind. Ct. App. 2000).

16

Plaintiffs allege the following to support a claim for constructive fraud: (1) that BOA owed a duty to them due to an established relationship; (2) that BOA breached this duty when it remained silent even though it "knew or should have known that the Plaintiffs were mistaken as to their loan terms and obligations"; (3) that Plaintiffs relied on this silence; and (4) as a result, they were injured while BOA gained an unfair advantage.  (Amended Compl. ¶¶ 62-66).

BOA argues that a "fiduciary or other 'special' relationship" is lacking here, and thus, the claim should be dismissed.  Under Indiana common law, "[m]ortgages do not transform a traditional debtor-creditor relationship into a fiduciary relationship absent an intent by the parties to do so."  *Huntington Mortg. Co. v. DeBrota*, 703 N.E.2d 160, 167 (Ind. Ct. App. 1998).  Indeed, a "lender does not owe a fiduciary duty to a borrower absent some special circumstances."  *Id.*; *see also Paulson v. Centier Bank*, 704 N.E.2d 482, 490 (Ind. Ct. App. 1998) (finding no fiduciary duty existed between a bank and borrower where a borrower secured a substantial loan for another investment and the bank neither offered advice nor made representations about the soundness of the investment).  These special circumstances include the existence of a confidential relationship between the parties and "the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge."  *DeBrota*, 703 N.E.2d at 167 (quoting *Peoples Trust Bank v. Braun*, 443 N.E.2d 875, 879 (Ind. Ct. App. 1983)).  In addition, for special circumstances to exist the dominant party must have "wrongfully abused the confidence by improperly influencing the weaker so as to obtain an unconscionable advantage."  *Id.*

17

Plaintiffs argue that special circumstances were created when BOA's agents "dispens[ed] advice about its competing [loan] modifications" -- the HAMP program and another loan modification.  (Pls.' Resp. 7).  According to Plaintiffs, they were "facing losing their home" and "had no ability to compare the terms of the competing modifications," and thus, were in a position of "inequality, dependence, weakness, and lack of knowledge."  (*Id.*).

The Seventh Circuit provides guidance.  In *Wigod v. Wells Fargo Bank N.A.,* the Court considered whether a borrower/lender relationship involving HAMP gave rise to a "special trust relationship" under Illinois law.  673 F.3d 547, 571 (7th Cir. 2012).  The borrower argued that this type of relationship existed because HAMP required the bank to provide borrowers with information to help them understand the terms, and thus, she relied on the bank to convey accurate information about the program.  *Id*. at 573.  Under Illinois law, a special trust relationship is "extremely similar to that of a fiduciary relationship" and exists where a party is "clearly dominant, either because of superior knowledge of the matter derived from overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side."  *Benson v. Stafford*, 407 Ill. App. 3d 902, 919 (2010); *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 657 (2001) (internal quotation marks and citation omitted).

The Court rejected this argument, because to hold otherwise would create a special trust relationship between virtually any mortgage lender and borrower – "a proposition Illinois courts have clearly rejected."  *Wigod*, 673 F.3d at 573; *see Graham v. Midland Mortg. Co.,* 406 F.Supp.2d 948, 953 (N.D.Ill.2005) ("Under Illinois law, a mortgagor-

mortgagee relationship does not create a fiduciary relationship as a matter of law"). As a result, the Court concluded, "Wells Fargo's participation in HAMP is not sufficient to create a special trust relationship with [the plaintiff] and the roughly 250,000 other homeowners with whom it entered TPP Agreements." *Id* at 571. The Court explained:

> The HAMP modification is an arm's length-transaction between servicer and borrower, no less than is a home mortgage loan itself. By becoming Wigod's HAMP servicer, Wells Fargo did not assume significant additional responsibility for handling Wigod's business affairs. Like the original mortgagor-mortgagee relationship itself, the relevant aspects of the HAMP servicer-borrower relationship do not bear the fiduciary-like hallmarks of a special trust relationship under Illinois law.

*Id*. at 573.

Though the Court interpreted Illinois law in *Wigod*, the same reasoning applies here, as a "special trust relationship" under Illinois law is analogous to the special circumstances required to create a fiduciary duty between a borrower and lender under Indiana law. *See DeBrota*, 703 N.E.2d at 167 (stating a "lender does not owe a fiduciary duty to a borrower absent some special circumstances"). BOA advising Plaintiffs about the HAMP program and competing modifications did not give rise to special circumstances under Indiana law. Plaintiffs' list of factors that allegedly create a special relationship with BOA are presumably present in almost every instance that a HAMP modification is offered; consequently, finding those circumstances alone are sufficient would run afoul with the Court's view that a HAMP modification does not create such a relationship. Thus, no "fiduciary or other 'special' relationship" exists, and Plaintiffs'

claim fails.  Accordingly, BOA's motion to dismiss is **GRANTED** for Plaintiffs'

constructive fraud claim.

### 3.  Breach of Contract

To establish a claim for breach of contract under Indiana law, a plaintiff must

prove: (1) a contract existed; (2) the defendant breached the contract; and (3) the plaintiff

suffered damage resulting from the breach.  *Collins v. McKinney*, 871 N.E.2d 363, 370

(Ind. Ct. App. 2007).  Plaintiffs allege that BOA breached the TPP contract when it

rejected their application for modification for lack of information even though they

"complied with all the terms of the TPP by making the temporary payments and

providing honest information" in a "timely manner."  (Amended Compl. ¶¶ 58-60).

It is axiomatic, though, that a contract must first exist for there to be a breach.  A

contract requires an "offer, acceptance, consideration, and a meeting of the minds of the

contracting parties."  *Batchelor v. Batchelor*, 853 N.E.2d 162, 165 (Ind. Ct. App. 2006).

An offer is defined as "the manifestation of willingness to enter into a bargain, so made

as to justify another person in understanding that his assent to that bargain is invited and

will conclude it."  *Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005)

(quoting Restatement (Second) of Contracts § 24 (1981)).  That said, a "manifestation of

willingness to enter into a bargain is not an offer if the person to whom it is addressed

knows or has reason to know that the person making it does not intend to conclude a

bargain until he has made a further manifestation of assent."  Restatement (Second) of

Contracts § 26 (1981).  This "reason to know" hinges "not only on the words or other

20

conduct, but also on the circumstances, including previous communications of the parties and the usages of their community or line of business." *Id.*

Here, BOA argues that Plaintiffs failed to provide sufficient documentation necessary to complete the modification review, and thus, BOA justly rejected their application. In other words, Plaintiffs failed to satisfy their obligations to enter into the contract, so no contract was formed. The court agrees as conditional language throughout the TPP and other correspondence clearly shows that BOA did not manifest a willingness to enter a bargain with Plaintiffs.

First, the letter introducing the HAMP program illustrates that acceptance into the program is not automatic. It alerts the possibility of rejection, stating, "If for some reason you are not eligible for the Home Affordable Modification Program once you've started the trial period, we will contact you and review other options." (Amended Compl., Ex. C). Next, language in the TPP repeatedly states the conditional status of the offer, such as (1) "*If I am in compliance with this Trial Period Plan* . . . the Servicer will provide [the modification]" and (2) the borrower is required to verify his income "*to determine whether [he] qualifies for the offer* described in this Plan." (*Id.*) (emphasis added). The letter further states that "the Servicer will send [the borrower] a signed copy of this Plan if [he qualifies] for the Offer or will send [him] written notice that [he] does not qualify for the Offer." (*Id.*).

Additionally, Section 2 states:

> I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents *will not be modified unless and until* (i) *I meet all the conditions required for modification*; (ii) I receive a fully executed copy

21

of a Modification Agreement, and (iii) the Modification Effective Date has passed.  I further understand and agree that *the Servicer will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan*.

(*Id*.) (emphasis added).

Finally, Section 3 of the TPP again shows the conditional nature of the plan as it

states:

> *If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects*, the Servicer will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary . . . ."

(*Id*.) (emphasis added).

Taken together, the language of the TPP is clear that the TPP was not an offer by

BOA to Plaintiffs which Plaintiffs could accept by simply providing further

documentation.  Instead, it was an invitation for Plaintiffs to apply to the program, which

required Plaintiffs' compliance to be considered for the program.

Plaintiffs, however, did not comply with such requirements as indicated by letters

from BOA to Plaintiffs dated February 22, 2010 and May 21, 2010.  (*Id*. at Exs. E, F).

The February letter stated that BOA was unable to finalize the TPP because it was still

missing some of the required documents while other documents contained incorrect or

missing information.  (*Id*. at Ex. E).  The May letter states that after a review of

Plaintiffs' request for a loan modification, Plaintiffs' loan is not eligible because

Plaintiffs "did not provide [BOA] with the documents [it] requested."  (*Id*. at Ex. F).

Thus, Plaintiffs failed to comply with the requirements for applying to the HAMP

program, so a contract was never formed.  Plaintiffs knew or should have known that

BOA did not intend to create a loan modification until it decided whether Plaintiffs satisfied the TPP's requirements.  As a result, no valid contract existed between the parties, so there could be no breach.

Finally, Plaintiffs' reliance on *Wigod* is misplaced.  There, the Seventh Circuit held that plaintiff sufficiently pled each element of her breach of contract claim where she applied for a permanent loan modification (also under TPP), but after complying with all conditions the servicer refused to provide a permanent modification.  *Wigod*, 673 F.3d at 561.  Although the same loan language is present in the modification here, a critical distinction exists -- the servicer in *Wigod* countersigned the Plan and mailed a copy back to the borrower with a letter congratulating her on her approval for a trial modification. *Id*. at 562.  The Court further explained that these actions "communicated to [the borrower] that she qualified for HAMP and would receive a permanent 'Loan Modification Agreement' after the trial period," provided she met the listed conditions. *Id*.

In contrast, the evidence shows BOA repeatedly alerted Plaintiffs by written correspondence and telephone that their submissions were not sufficient.  (Amended Compl., Exs. E, F).  As the Court pointed out in *Wigod*, upon receiving the financial information from the Plaintiffs, BOA had the opportunity to determine whether Plaintiffs qualified.  673 F.3d at 562.  And to that end, "if [they] did not, *it could have and should have denied her modification* on that basis."  *Id*. (emphasis added).  This denial is precisely what happened here, so no contract was formed.  Accordingly, BOA's motion to dismiss Plaintiffs' breach of contract claim is **GRANTED**.

### 4.  Negligence

To establish a prima facie claim of negligence under Indiana law, plaintiff must show: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; and (3) injury to the plaintiff proximately caused by that breach.  *Kincade v. MAC Corp.*, 773 N.E.2d 909, 911 (Ind. Ct. App. 2002).  Plaintiffs allege that BOA was negligent in "failing to disclose material information about the amount of funds applied to principal and amount of funds applied as interest to Plaintiffs upon their request." (Amended Compl. ¶ 53).

BOA argues that no duty exists, and thus, there can be no breach; therefore, Plaintiffs' claim for negligence fails.  Plaintiffs allege that BOA "owed Plaintiffs a duty of reasonable care regarding processing payments, applying funds to principal and interest, and disclosing the nature of this allocation."  (Amended Compl. ¶ 54).  Plaintiffs further argue that RESPA "creates a duty for mortgage services to respond to written requests for information."  (Pls.' Resp. 6).  In other words, Plaintiffs argue that a violation of RESPA establishes negligence per se under Indiana law.

Duty may be based on common law principles of negligence or on the violation of a statute.  *Rubin v. Johnson*, 550 N.E.2d 324, 329 (Ind. Ct. App. 1990).  "The unexcused violation of a statutory duty constitutes negligence *per se* if the statute or ordinance is intended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred as a result of its violation."  *Erwin v. Roe*, 928 N.E.2d 609, 616 (Ind. Ct. App. 2010) (citation omitted).  This is because

"negligence *per se* accepts the legislative judgment that acts in violation of the statute constitute unreasonable conduct." *Id.*

Here, as noted above, Plaintiffs' claim for a violation of RESPA survives the motion to dismiss. RESPA is a "consumer protection statute that regulates the real estate settlement process, including servicing of loans." *Catalan*, 629 F.3d at 680 (citing 12 U.S.C. § 2601 (Congressional findings)). Thus, Plaintiffs, as typical borrowers in the real estate scheme, belong to the class of persons this statute attempts to protect. Further, the harms alleged – misapplied payments, an adverse credit rating, and an incorrect Mortgage balance – are precisely the type of harms this statute is intended to protect against. By creating a framework that requires timely responses and substantive answers, Congress attempted to prevent borrowers from being left in the dark with no where to turn, just as Plaintiffs allege they were here. As a result, though it is yet to be determined whether BOA violated RESPA, at this stage of the proceedings these allegations are sufficient to survive a motion to dismiss and put BOA on notice that it must defend against a claim for negligence per se. *See Sarsfield v. Citimortgage, Inc.*, 667 F. Supp. 2d 461, 469 (M.D. Pa. 2009) (finding that allegations of RESPA violations were sufficient to constitute negligence per se and survive a motion to dismiss); *Rawlings v. Dovenmuehle Mortg., Inc.*, 64 F. Supp. 2d 1156, 1167 (M.D. Ala. 1999) (holding defendant "had legal duty arising from a statute because § 2605 of RESPA imposes duties on mortgage loan servicers," including taking certain actions in response to a QWR). Accordingly, BOA's motion to dismiss is **DENIED** on Plaintiffs' negligence claim.

### IV.     Conclusion

For the reasons set forth above, Defendant's motion to dismiss (Docket # 27) is

**GRANTED IN PART and DENIED IN PART**.  The court **GRANTS** Defendant's

motion for the fraud, breach of contract, and constructive fraud claims, but **DENIES**

Defendant's motion with respect to the RESPA and negligence claims.

**SO ORDERED** this 25th day of March 2013.

                                      _____

                                      RICHARD L. YOUNG,  CHIEF JUDGE
                                      United States District Court
                                      Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.